Keefe v. Chicago, Burlington & Quincy R. Co., 213 Ill. App. 187.

# Richard J. Keefe, Appellee, v. Chicago, Burlington & Quincy Railroad Company, Appellant.

## Gen. No. 23,853.

1. MASTER AND SERVANT, § 683*—*when negligence shown in causing injury to engineer due to engine colliding with train buckled on track from adjoining track.* In an action by a passenger engineer for personal injuries received when his engine collided with freight cars which were thrown upon the track by the buckling of a freight train on an adjoining track, evidence *held* sufficient to show negligence on the part of some officer, agent or employee of the carrier, so as to satisfy the requirement of the Federal Employers' Liability Act, and to prevent the Appellate Court from holding that a verdict for plaintiff was against the weight of evidence.

2. MASTER AND SERVANT, § 683*—*when shown that freight train was negligently run on main track after extra had entered block upon clear signal.* In an action by a passenger engineer for injuries received when his engine collided with freight cars which had been thrown on the track by the buckling of an extra freight train on an adjoining track, when it was suddenly stopped because of the unexpected appearance against it of the block signal and of the tail lights of a way freight train immediately ahead, evidence *held* to justify the jury in finding that the way freight train was not on the main track all the time, as testified to by its crew, but that it was negligently run thereon after the extra had entered the block upon receiving a clear signal.

3. MASTER AND SERVANT, § 584*—*when doctrine of res ipsa loquitur in modified form applies to collision of engine with freight cars.* In an action by a passenger engineer for injuries received when his engine collided with freight cars thrown on the track by the buckling of an extra freight train on an adjoining track in making an emergency stop upon the unexpected appearance of the block signal against it, a modified form of the doctrine of *res ipsa loquitur held* available so that the facts of the wreck in connection with all the circumstances, such as the condition of the signals, the length of the train, its speed, the grade, the sudden discovery of the red signal, and the effort of the engineer of the extra to stop, left the inference of negligence on the part of defendant's employees, the only reasonable one to be drawn, so that the jury were justified in finding defendant liable, though no defect in the train, road or equipment was shown.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

188    APPELLATE COURTS OF ILLINOIS.

Keefe v. Chicago, Burlington & Quincy R. Co., 213 Ill. App. 187.

4. INSTRUCTIONS, § 125*—*when evidence sufficient as basis for.* Where the evidence tended to establish the negligence referred to in instructions, to which objections were taken, they were properly given.

5. DAMAGES, § 111*—*when verdict for personal injuries excessive.* Where a passenger engineer, 50 years old, who was in good health and earning $2,396 a year, was so injured that he suffered greatly and his capacity for valuable work was practically destroyed, he being broken down and unfit to do much work, even of a simple character, a verdict for $30,000 was *held* excessive and reduced to $20,000.

Appeal from the Superior Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1917. Affirmed on remittitur; otherwise reversed and remanded. Opinion filed January 29, 1919. Rehearing denied February 10, 1919. *Certiorari* denied by Supreme Court (making opinion final).

J. A. CONNELL and THOMAS J. LAWLESS, for appellant.

THOMAS J. SYMMES and MORSE IVES, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

Richard J. Keefe, as plaintiff, brought suit against the defendant for personal injuries and on August 3, 1917, recovered judgment in the sum of $30,000. From that judgment this appeal is taken.

The declaration contains six counts. The first count avers that while the plaintiff, as engineer, was operating a locomotive hauling a passenger train belonging to the defendant, the latter so negligently operated a freight train belonging to it that a certain car near the middle of said freight train was broken and crushed and thrown on the track on which plaintiff was running his train, by reason of which the engine which the plaintiff was operating was thrown from the track and the plaintiff thereby injured.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The second count avers that the defendant negligently caused the speed of said freight train to be so suddenly and abruptly retarded as to break and crush a car in the middle of the freight train, and cause it to be thrown upon the track in front of the engine that was operated by the plaintiff; by reason of which the engine operated by plaintiff was thrown over and the plaintiff thereby injured.

The third count avers that the defendant negligently permitted a certain train of freight cars to block the road at a certain point without sufficient notice to the engineer of the eastbound freight, and that, as a result, the engineer of the latter train was compelled to slacken the speed of his train in such a sudden and violent manner that a car near the middle was broken and thrown over upon the track on which the plaintiff was operating his train, and as a result his engine was thrown over and he was injured.

The fourth count avers that the defendant negligently managed certain freight trains so that the engineer of one, in order to avoid a collision with the other, was compelled to so suddenly and violently slacken the speed of his train that a car was crushed and thrown out upon the track on which the plaintiff was running his engine; the result being that the latter was thrown over and the plaintiff injured.

The fifth count avers that the defendant so negligently managed its signals that the engineer of the eastbound freight received no warning that another freight was ahead of him until he was so close that in order to avoid a collision he was compelled to so suddenly slacken the speed of his train that one of the cars in his train was crushed and thrown out, and the engine operated by plaintiff was thereby thrown over and the plaintiff injured.

The sixth count avers that the wreck occurred by reason of a defective car constituting part of the freight train.

About 6:10 p. m. on September 20, 1916, the date of

the injury, the plaintiff, an experienced engineer who had been employed by the defendant as such for 24 years, left Chicago as engineer of a passenger train known as the Chicago & Kansas City Limited, bound for Kansas City. He had been hauling that train for 2 months. His run was from Chicago to Galesburg. The train contained 9 cars. The engine was known as the S-1 Pacific type. He stopped the train at Canal and 16th Streets for a railroad crossing, and then went on intending to make the next regular stop, which was Aurora. At La Grange there are two stations, Fifth avenue and Stone avenue, the latter being further west. There were three main tracks, the middle track being the westbound track and the one on which the plaintiff was running his train. When he was in the neighborhood of Stone avenue, La Grange, he saw a block signal west of Stone avenue, and from 20 to 25 car lengths east of that signal he saw a train going east, the engine of which was headed east, and after passing Stone avenue and that train he saw another train east of Western Springs, which station is the next station west of La Grange, and that train was also headed east and was on the track south of the one he was on. When he reached Clyde, which is known as the west end of the freight yards of the Burlington and is just outside of Chicago and about 3 miles east of La Grange, he was 4 minutes late. His train was going about 40 miles an hour. After he passed the second engine, a distance equal to about 15 or 20 cars, he heard a crashing of cars, and looking ahead he saw fire flying from the wheels of the freight train—which was on the track just left of him—about 200 or 300 feet ahead. He leaned out of the cab window and then saw a box car come out of the train on the track in front of him. It came out over the south rail of the track his engine was running on. He called out to his fireman and pushed the brake out upon the emergency and set the air brakes. He then grabbed

for the throttle, and then the crash came. The engine was thrown over and the engineer burned by escaping steam and otherwise very seriously injured.

The wreck occurred at 6:40 p. m.—after dark— about halfway between La Grange and Western Springs, which towns are about a mile and a half apart. In that vicinity the defendant railroad consists of three main parallel tracks, running in a general easterly and westerly direction, together with two switch tracks which are to the south, the first of which holds about 24 cars, and the other 9 cars. The 24-car switch track leaves the main south track at a point just west of Brainard avenue in La Grange, and south from that 24-car switch track the 9-car switch runs in front of the freight house.

The movement of trains on the railroad of the defendant at the place in question was regulated by a system of automatic signals which were displayed, over each main track, upon a suspended structure called a signal bridge. For use in the daytime the signals were two extended arms, the upper red and the lower green. When both were up, that is, at horizontal, they meant "stop," and when the green board alone was up it meant "caution"; and when both were halfway down, that is oblique, they meant "clear block." At night, the signal for "stop" was a red and green light; for "caution" a green light, and for "clear block" a white light. The mechanism which operated the boards or arms, and therefore the lights, was electrical and was set in motion by the wheels of an engine or car passing over what are called insulated joints in the rails located within a few feet of each block—the latter being the extension of track between two signal bridges. Each train set two signals, that first back of it being set at "stop," that is, at night, red and green lights, and the second back of the train being set at "caution," that is, at night, a green light. There were two signal bridges about 4,000 feet apart, between Stone avenue on the east and Western

Springs on the west. They will be referred to hereafter as the Stone avenue and Western Springs signals. The signals were so arranged that when the block just east of the signal near Stone avenue was actually occupied, that signal would show "stop," and the signal near Western Springs, being the next west, would show "caution"; that is, after dark, the signal at Western Springs would be green and the next signal east, being the first signal west of Stone avenue, would be red and green.

The freight train, which was the physical cause of the wreck, was known as an extra freight. It was made up on the morning of September 20, 1915, at Galesburg and was fully inspected there and subsequently at Buda and Mendota. It was a long train, consisting of an engine and 84 cars, most of which were loaded with merchandise. It had been running well all the way from Galesburg. There is a down grade all the way east from the Western Springs signal to and beyond Stone avenue. Before reaching Hinsdale, one and six-tenths miles west of Western Springs, the steam had been shut off owing to the down grade, and was not again put on. It passed the Hinsdale tower at 6:35 p. m. Going through Western Springs it was running about 20 miles an hour. The men in charge of the extra freight were Malloy, Conductor, Cratty, engineer, Soloski, fireman, and Waegle and Nelson, brakemen. Malloy stated that after leaving Aurora the greatest speed of the extra freight was from 30 to 35 miles an hour and that at Gregg's Hill the train was running about 25 miles an hour. Nelson, the head brakeman, testified that just west of Western Springs they were going down hill at about 20 miles an hour. Cratty, the engineer, puts it at 20 miles an hour. Soloski, the fireman, testified that just east of Western Springs they were going from 20 to 25 miles an hour. Waegle testified that the speed was 20 miles an hour up to the time of the wreck.

At 6:16 p. m., from 15 to 20 minutes ahead of the

extra freight, there had gone out east from Hinsdale a way freight, of which one Joos was the conductor. The latter, before leaving, had been informed by the train dispatcher at Hinsdale that the extra freight was following him. That information, according to the train dispatcher, was given him "so that he might be able to govern himself accordingly, * * * to notify him just what to do when he got to Stone avenue, so that he might get into the clear for the same." The way freight went east through Western Springs and stopped on the south main track east of the Stone avenue signal bridge. Joos, its conductor, then began picking up and setting out cars and unloading merchandise. That was done on the 24-car switch and the 9-car freight house switch. The 24-car switch leads off the main eastbound south track just west of Brainard avenue, and runs west. Joos testified that before the wreck they picked up cars off the 24-car track and off the 9-car track and also put cars back on the 9-car track, and that they also took some cars off both those tracks and put them on the train; that at the time of the wreck there must have been 9 or 10 cars in his train, all coupled together, standing on the eastbound track west of the switch; that the Stone avenue signal bridge was 7 or 9 cars west of the rear end of his train, and the signal had been at "stop" from the time his engine reached the block until the wreck; that he knew the extra freight was following him; that while his crew were working he saw the headlight of the extra freight show up; that they were ready to leave town; that they had all their work done; that he thinks he said "we pull back in the clear and let the freight clear"; that one Tangney, his rear brakeman, was back of his train 8 or 10 car lengths with the proper signals; that having finished his work he was figuring on getting down in the clear; that his whole train, with the engine attached, was on the main line; that he was under the impression that he had started to back in, evidently meaning off the main line onto the 24-car

switch. Moyer, a brakeman on the way freight, testified that the caboose of the way freight stood on the main track 8 or 9 car lengths east of the Stone avenue signal bridge all the time until the wreck occurred. Carr, a brakeman on the way freight, testified that the way car of the way freight and those cars that were going through stood on the main track; that the way car was in the same place all the time; that the first signal back was "danger" and the next "caution" as long as he stood there. Tangney, a brakeman on the way freight, testified that when the way freight arrived at Stone avenue, they left the way car on the main track; that they cut the engine off and went in and loaded merchandise; that the way car stood opposite the depot on the main track all the time; that when the engine was cut off he went back of the way car 12 to 15 car lengths to flag; that he was east of the signal bridge; that he saw the red and green signals both up; that when the passenger train was passing his train pulled out and backed in; that the way car stood there until the passenger train passed; that the way freight did not continue to stand there until the freight train came up behind; that when the passenger train passed they threw the switch and backed in; that when the extra freight came to a stop the caboose of the way freight was backing in; that part of the way freight was on the main track; that the way car was just about at the switch; that he could see the tail lights on the main track.

Cratty, the engineer of the extra freight, when his train, running about 20 to 25 miles an hour, was about 20 car lengths east of Western Springs, put on, according to his testimony, 10 pounds of air, which he testified was customary with him on that train. Whether or not at the time his engine passed the Western Springs signal that signal showed green or white is disputed. The engineer stated that when he reached the block at Western Springs there was not any green bar up and there did not seem to be any

green light; that he thinks he would have seen it had it been there; that he knew if there was no green bar up at Western Springs that he would have a clear track for 2 blocks ahead. As to the Stone avenue signal, he stated that he did not notice the signal go up but that when he had just passed the Western Springs signal, about 40 car lengths, he first saw the Stone avenue signal and that it was red and green; that at that time he could see the red lights on the caboose of the way freight but could not tell whether it was on the sidetrack or on the main track in front of him; that as he approached it he saw a white light which he supposed was that of a brakeman; that it was giving a signal to back in, a back-up signal; that it was a lantern whirling around; whirling around means to hurry; that as soon as he saw the way car ahead of him and saw the tail lights and markers red he made the application of air so as to stop at the Stone avenue signal. The extra freight at that time carried between 65 and 70 pounds of air. Cratty testified, further, that at the time he made the first application of air the passenger engine was east of him; that when the passenger engine passed his engine he was about 30 or 40 car lengths east of Western Springs signal and was running about 20 to 25 miles an hour, slowing down; that as soon as he saw the way car ahead of him and saw the tail lights and markers red he made a 10-pound application of air so as to stop at Stone avenue signal; that the air went on gradually and the train began to slow down; that it went about 30 or 35 car lengths slowing down; that at the end of 20 car lengths after applying the air he had slowed down to 12 or 15 miles an hour and the train was running smoothly; that when he undertook to put on air a second time, "we got a jar from the hind end"; that he thinks he made the other application. His language is: "I put it on, but that did the whole thing. They gave us a pretty hard jar." He further testified that after the air went away he could not control the speed of the

train; that he let it go on as far as it would and stop; that it went about 4 or 5 car lengths before it stopped; that when the bump came that was the last of his control of the engine; that slacking up might cause a bump; that he supposed the bump was caused by the slack coming up; that he does not know what happened; that his train traveled about 800 feet after putting on the first application of air before the "bump" came; that he was then about 20 car lengths from the Stone avenue block. He gave it as his opinion that his train, going from 10 to 15 miles an hour, and having the brake shoes on, would have reached a stop west of the Stone avenue block. He also testified that he did not think he used sand before coming to a stop and that he did not reverse the engine before the train stopped.

The evidence of Soloski, the fireman on the extra freight, is to the effect that when they passed the Western Springs signal there was no board up and no green light showing; that it was white; that when the first application of air was put on, the engine was about 1,200 or 1,300 feet east of Western Springs signal; that he thought the application was made because the engineer saw the block ahead and they were going down grade. He further testified that he saw a caboose on the sidetrack with tail lights or markers burning red; that that was just prior to the first application of air. On cross-examination Soloski stated that he did not see the engineer reverse the engine at the time he made the application of air and that he did not know whether the engineer opened the sand valve and that he did not know whether the engineer in making the second application of air put on all the air he had. As a matter of impeachment, there was offered in evidence a signed written statement by him which contains the following: "After leaving Aurora we got clear blocks at all blocks including the block at Western Springs, and when we came to the block at Stone avenue it was against us, or set at

Keefe v. Chicago, Burlington & Quincy R. Co., 213 Ill. App. 187.

'stop.' There was also a caboose on the sidetrack with tail lights or markers turned red. Engineer Cratty applied the air to stop, but, when he saw he was not going to make the stop, he reversed his engine, opened the sand valve to put sand on the rail, and put on all the air he had on the second application. He went past the block some but I do not know how far.''

Nelson, the brakeman on the extra freight, and who was on the engine standing near the firebox door, testified that as the passenger train went by—at about 30 to 35 car lengths west of the Stone avenue signal— he heard the engineer of the extra freight make an application of air; that he stepped to the gangway but the smoke from the passenger engine obscured his view; that as it cleared away he saw the signal board just west of Stone avenue and ''we stopped instantly''.; that he said to the engineer ''the way freight is down ahead of us''; that the light on the caboose of the way freight was on the main line; that he saw the signal near Stone avenue go red; that the way freight backed in and he saw the ''switch go red'' on the sidetrack; that after he stepped to the gangway and saw the light go red and said the freight must be ahead on the track, Cratty applied the air; that when the extra freight stopped it was west of the Stone avenue signal bridge; that the drawbars of some cars west of the engine were shoved in.

The plaintiff testified in regard to statements made by Nelson—which were incorporated in a writing signed by Nelson and offered in evidence but which does not appear to have been preserved in the record —that Nelson stated that the main track switch that leads to the sidetracks was open; that he, Nelson, saw someone giving a signal for the way freight to back up and that the way freight backed into the sidetrack off the main track; and, further, that he did not know how far Engineer Cratty went past the block. Whereas, in his testimony, he claimed that the extra freight

stopped short of the Stone avenue signal.

Shortly after Cratty, on the extra freight, made the first application of air, after he had passed the Western Springs signal, one of the cars of his train was crushed out; and then about 20 seconds later after the second shock, which according to Malloy was severe, cars began to go out first on one side and then on the other. The first car that went out on the northerly side went over on the main westbound track and was the physical cause of wrecking the passenger engine which the plaintiff was running. When the extra freight finally stopped, the 27 cars, next to the way car of the extra freight, were on the track. The next 6 cars east were badly smashed up. Beyond them to the east there were 4 cars still on the track and uninjured; following them to the east there were 7 more cars that were badly crushed. The track remained intact save where the 17 cars—being the 13 that were crushed and the 4 intermediate that were uninjured— had been, and there it was torn up. The 41 cars beyond, and up to the engine, were practically uninjured, save that some of the drawbars of those near the engine were shoved in. Nearly all the cars were loaded with either grain, coal or lumber. The evidence does not show whether the first car that was crushed out was one of the 7 or of the 6. There was 1 empty car among the 7, a "Penn. Car," which was all smashed up. It had a steel underframe, and according to Malloy did not seem to be a bad car.

The evidence shows that, as far as known, the extra freight was properly made up and had been carefully inspected a number of times as to the condition of the cars, air brakes, etc., and was found to be in first-class condition; also that the tracks and roadbed were in good repair and good working order.

Immediately after the derailment of the passenger engine, the plaintiff was taken out of the wreck and to a drug store at Western Springs; from there he was taken to a sanitarium at La Grange where his wounds

were dressed. Eight days afterwards, on a stretcher, he traveled to Galesburg and was there placed in the hospital, where he remained until some time in March, 1916, when he went home. At the time of the wreck he was burned on the face, ears, right hand, right arm, back and both legs, the right leg from the knee down being very seriously and permanently injured. The evidence shows that at the time of the trial the use of the right leg was almost entirely destroyed; that his health was very much impaired, his nervous system affected and that there were various other injuries which were permanent. At the time of the injury the plaintiff was 50 years old, in good health, and just prior thereto was earning as engineer about $2,396 a year.

At the close of the plaintiff's evidence, and also at the close of all the evidence, the defendant moved the court to instruct the jury to find the defendant not guilty. Both motions were overruled. The jury returned a verdict finding the defendant guilty and assessed the plaintiff's damages in the sum of $30,000, and on August 3, 1917, after the motions of the defendant to vacate and set aside the verdict and to grant a new trial had been overruled, the trial court entered judgment on the verdict in favor of the plaintiff and against the defendant in the sum of $30,000. From that judgment this appeal was taken.

The plaintiff's cause of action is based on the Federal Employers' Liability Act. Pursuant to that act a defendant is liable in damages to an employee for injuries "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, * * * or other equipment." Employers' Liability Act of April 22, 1908, 35 U. S. Stat. 65. The liability of the defendant, therefore, is dependent upon the negligence of some officer, agent or employee, or upon any

defect or insufficiency in its cars, engines, track, or other equipment due to its negligence. *Seaboard Air Line Ry. v. Horton,* 233 U. S. 492 [8 N. C. C. A. 834]; *New Orleans & N. E. R. Co. v. Harris,* 247 U. S. 367, 38 Sup. Ct. 535.

Inasmuch as it is practically admitted that no defect or insufficiency in the cars, track or other railroad equipment was shown, it became necessary for the plaintiff to prove that the injury he suffered was caused in whole or in part by reason of the negligence of some one or more of the employees of the defendant who were in charge of the way freight, of the extra freight, or both.

It is the theory of the plaintiff: First, that when the extra freight passed the Western Springs signal it was white; that Cratty, the engineer, therefore, received no caution; that shortly after passing that signal he saw the Stone avenue signal red and green; that he saw red lights on the caboose on the way freight but could not tell whether the caboose was on the side-track or on the main track in front of him; that as soon as he saw the way car ahead of him and saw the red light at the Stone avenue signal, he suddenly found it was necessary to stop before reaching the Stone avenue block; that, under the circumstances, he was impelled to put on air so as to stop before reaching the Stone avenue signal; that he did so, and as a result, by reason of going down grade and having a heavy train traveling at 20 to 25 miles an hour, his train was wrecked; second, that Joos, the conductor of the way freight, having been informed by the train dispatcher that the extra freight was following him, by keeping his train on the main track, and therefore blocking the movement of the extra freight, was guilty of negligence. On the other hand, it is the theory of the defendant that whether or not the Western Springs signal showed white or green, it was of no importance, inasmuch as, if it had been green, it would only have operated as an admonition to Cratty to have

his train under control, and as a matter of fact—according to defendant's claim—the evidence shows that Cratty had reduced the speed of his train and did have control immediately after passing that signal; that Cratty undertook to stop his train upon seeing the red signal at Stone avenue, and in doing so put on an amount of air which under the circumstances was reasonable and normal; that the breaking of the train and the throwing out of the cars onto the westbound track and precipitating the wreck and causing the injury to the plaintiff took place without any dereliction of duty and without any evidence of defect or insufficiency in the engine and cars of the extra freight.

The distance between Western Springs and Stone avenue signals was about 4,000 feet, or the equivalent of 100 car lengths; the extra freight, being composed of 84 cars together with the engine, was approximately 3,400 feet long.

The following facts, some of which are in dispute, are important: (1) The signals at Western Springs. (2) The signals at Stone avenue. (3) The speed of the extra through Western Springs and at the time the air was first applied. (4) The point arrived at after passing the Western Springs signals when the air was first applied. (5) The application of air. (6) The place where the engine of the extra was when the train finally stopped. (7) The effect of taking up the slack in the train after putting on the air. (8) The movements of the way freight.

(1) As to the signals at Western Springs: Nelson, the brakeman on the extra freight, being on the engine at the time the extra went through Western Springs, stated that he did not notice whether the the green board was up or not. Soloski, who was fireman on the extra, testified positively that the signal at Western Springs was white with no boards up. Cratty, the engineer who, as may be assumed, was doing his duty and knowing his responsibility in controlling the running of a train of such size, was on the lookout,

testified that when the extra reached the signal at Western Springs there was no green bar up; that if there had been he thinks he could have seen it; that he knew how the signals worked and that as there was no green bar up at Western Springs he knew that the two blocks ahead were both unoccupied.

(2) As to the signals at Stone avenue: Cratty testified that he did not see them go up but that just after he had passed the Western Springs signal he saw them and they were red and green; that also he saw the red lights on the way freight caboose but did not know if the way freight was on the main or the sidetrack. Soloski testified that after the extra passed the Western Springs signal about 1,200 or 1,300 feet, he saw the Stone avenue signal was red. Nelson was on the engine of the extra and testified that "after the smoke that obscured us, obscured our view, had passed away" that he saw the light go red and said to the engineer that the way freight must be down ahead on the track. Nelson further testified "as the smoke cleared away I saw the board signal. We stopped instantly."

(3) As to the speed of the extra through Western Springs and until it stopped: According to Cratty, when going through Western Springs the speed of the train was from 20 to 25 miles an hour. Malloy puts it at 22 miles. Nelson and Waegle at 20. The evidence justifies the conclusion that when Cratty first put on the air the extra was traveling between 20 and 25 miles an hour.

(4) As to the point arrived at after passing the Western Springs signals when the air was first applied: The evidence is somewhat confusing as to just what point between the Western Springs and Stone avenue signals the engine of the extra freight had reached when the air was first applied. Cratty, the engineer, says that 55 was east of him, not a great ways; that he was at least 30, perhaps 40, car lengths east of the Western Springs signal—though in one place he

put it at 20; that he went 25 car lengths after putting it on. Nelson says that there was an application of air at or just after the extra passed the Western Springs signal; that as 55 went by he heard Cratty put on the air, and Keefe says he passed the extra when he was about halfway between the two signals. Malloy says that the air was put on when the way car of the extra freight was about 40 car lengths west of Western Springs, so that the engine must then have been 44 or 45 car lengths east of the Western Springs signal. Waegle does not state where the train was at that time.

(5)    As to the application of air: Cratty testified that he put on 10 pounds and was doubtful about a second application. Malloy, who was in the cupola of the caboose at the rear of the extra, testified that there were three applications and that the first was about 15 pounds; that 20 seconds later there was a second application and then a third. Nelson, who was on the engine, testified that there were two applications.

(6)    As to the place where the engine of the extra was when it came to a stop. Cratty puts it at 20 car lengths west of Stone avenue signal: Moyer, the brakeman, from 20 to 25 car lengths west of Stone avenue. Malloy says that when the wreck occurred the way car was 10 car lengths west of Western Springs depot. Joos places it at from 15 to 20 car lengths west of the Stone avenue signal. Nelson, according to his testimony stated that it was short of the Stone avenue signal, but he was impeached on that subject as it was shown that he had stated at a prior time to that of giving his testimony that the extra freight went past the Stone avenue signal.

(7)    As to the slack and its relation to the wreck: Waegle, the brakeman on the extra, testified that between the cars there is always some inches of play in the movement of the drawbar; that with 84 cars it would be considerable. Malloy testified that the first shock caused the wreck; that the other shocks came

from the cars being mashed up and then the different parts of the train going together again. Cratty testified that when he went to make the second application of air, his train having gone from 20 to 25 car lengths after the first application—he fixes it at from 30 to 35 car lengths in another part of his testimony—and having slowed down from 25 to 12 or 15 miles an hour, "we got a jar from the hind end." That he supposed "it was the slack coming up" which did it; that after the "bump" his engine went 4 or 5 car lengths and then stopped.

(8)  As to movements of the way freight: Joos stated that he had been east of the Stone avenue signal about 15 minutes, picking up and setting out cars and unloading merchandise; that originally, and at the time of the wreck, there were 9 or 10 cars in his train; that at the time of the wreck they were all coupled together, standing on the eastbound track west of the switch at Brainard avenue; that the signal at Stone avenue was at "stop" all the time after his train reached that block; that, when he saw the headlight of the extra freight, his work was done and he was ready to leave; that he was under the impression he had started to back in. Moyer, that the way freight caboose was on the main track all the time and the Stone avenue signal set at "stop." Carr and Tangney, also, say that the caboose stood on the main track all the time. Tangney further stated that he saw both boards up at the Stone avenue signal; that when the engine of the extra came to a stop, the way freight was backing in, part of it being on the main track and part of it on the switch track.

In analyzing the evidence, the striking circumstance, of course, is what the two signals did actually show. And, as to that, we are of the opinion that the jury were well justified in believing that Cratty, the engineer of the extra, got into the block where the wreck occurred under what might be called false rep-

resentations.   Seeing that the signal at Western
Springs was neither green nor red—and such the evi-
dence sufficiently proves—he was entitled to assume
that immediately east of the Western Springs signal
there were two clear blocks.   The train he was hand-
ling being three-quarters of a mile long and traveling
through Western Springs from 20 to 25 miles an hour,
and going down grade, was not very easily controlled or
stopped, and what the signals showed at Western
Springs was of vital importance to him.   When, there-
fore, after he passed the Western Springs signal,
about 40 car lengths, and suddenly saw the Stone av-
enue signal set at red and then knew, and for the first
time, that, as a matter of safety, he must stop in that
very block, of course he put on air.   He says he put on
10 pounds, a normal amount.   Malloy says 15 pounds.
But, whatever it was, we feel bound to infer, as a mat-
ter of common sense, that it in all probability resulted
in breaking the train and precipitating the wreck.

The fact that while the Western Springs signal
showed white, the engine of the extra freight passed
it, and while in that block the Stone avenue signal
showed red, tends to prove that some employees of the
defendant were negligent; and further, tends strongly
to persuade the mind that in all probability the engi-
neer, being without prior warning and suddenly con-
fronted with imminent danger, put on air in such a
way as to stop quickly, and, in so doing, broke the
train.   Such evidence does not, of course, conclusively
prove that putting on air as he did broke the train,
but, considering what the physical circumstances them-
selves speak, which is a rightful use of a modified form
of the doctrine of *res ipsa loquitur,* also, the speed and
size of the train and that it was going down grade, to-
gether with the evidence in regard to the signals, all
taken together, we are of the opinion that there was
sufficient evidence, involving negligence, both to fulfil
the requirements of the Federal Employees' Liability
Act and, further, sufficient evidence to prevent us from

holding that the verdict of the jury was clearly against the weight of the evidence. The evidence showed a condition so abnormal, so fraught with unnecessary danger, as to admit of no other reasonable inference but that of negligence. And what answer does the defendant make? Merely that the signals, track, extra freight and equipment were in good order; that part of the way freight was, all the time, on the main east track; and that Cratty on the extra freight only put on a normal amount of air. But all that does not refute the evidence of Cratty and Soloski that the extra freight was caught in a trap and, unexpectedly, had to be quickly stopped. Nelson said, "as the smoke cleared away I saw the board signal. We stopped instantly." Counsel for the defendant urge that the signal at Western Springs was of no importance because they say Cratty had his train under control. We do not think, however, that the evidence justifies the conclusion that he had his train under control.

Cratty and Malloy both say, substantially, that the air was first applied when the extra was 40 car lengths east of Western Springs signal, which would leave only about 60 car lengths between the engine of the extra and the Stone avenue signal. There was a train composed of an engine and 84 freight cars, most of the latter loaded, going down grade at not less, probably more—Cratty himself puts it in one place at 25 miles an hour—than 20 miles an hour, and when within 60 car lengths of the Stone avenue signal the engineer for the first time sees that it is red, is informed that there is danger ahead and he must stop.

Further, considering on one hand the evidence of the defendant's witnesses, Cratty and Soloski, that the signal at Western Springs showed white, and on the other hand, the evidence of the witnesses as to the way freight being in whole or in part on the main east track all the time, which would have made the Western Springs signal show green, and having in mind the discrepancies in the testimony of the different wit-

nesses as to the position and movements of the way freight, and bearing in mind also the testimony of Cratty and Soloski and Nelson as to the Stone avenue signal going red, it may well be that the jury came to the conclusion that, at the time the extra freight came up and passed Western Springs signal, the way freight had gone in off the main track and that shortly afterwards—for Joos said that the way freight was ready to leave, that they had all their work done—when the engine of the extra freight had gone some distance past the Western Springs signal, the way freight went out on the main track and set the Stone avenue signal red, making it necessary for Cratty, without any prior caution or warning, to undertake to stop his train somewhat suddenly, and that in so doing, considering the speed at which his long, heavy train was going down hill, he put on, under the circumstances, an unusual amount of air and so broke his train and precipitated the wreck.

Bearing in mind that Cratty was entitled to conclude, when he saw no red or green signal at the Western Springs bridge, that he had a clear track for two blocks, he must have been suddenly surprised after traveling some distance in the block between Western Springs and Stone avenue to see the Stone avenue signal "red"; and if we assume—as we are entitled to from the evidence—that the automatic signals were in good working order, we are bound then to infer that the Stone avenue signal became red after Cratty had passed the Western Springs signal, and became red as the result of some movement of the way freight which took place after Cratty passed the Western Springs signal; and although Cratty did not know until he saw the tail lights of the way freight that it was ahead of him, Joos, the conductor of the way freight, who was switching east of the Stone avenue signal, knew from the time he left Hinsdale that the extra freight was following and only a few minutes behind him. It is true that many of the witnesses say that

208    APPELLATE COURTS OF ILLINOIS.

Keefe v. Chicago, Burlington & Quincy R. Co., 213 Ill. App. 187.

the way car of the way freight, or some part of the
way freight, remained on the main track from the
time the way freight passed east of the Stone avenue
signal, but in view of the fact testified to by Cratty,
that there was no green bar up or green light at the
Western Springs bridge, and that of Soloski, that
there were no boards up and that the signal was white,
the jury may have given credit to the latter testimony
in preference to that concerning the way freight re-
maining on the main track; and, if they did, they were
justified in concluding that some part of the way
freight went out on the main track east of the Stone
avenue bridge after Cratty on the extra freight had
passed the Western Springs signal, and that the de-
fendant was guilty of negligence.

As to the operation of the doctrine of *res ipsa lo-
quitur*, there seems to be no doubt but that the prin-
ciple therein involved may be considered here avail-
able for what under the circumstances it is worth. As
said in *Southern Ry. Co. v. Derr*, 240 Fed. 73: "When
we concede that the maxim may apply to such an action,
it by no means follows that it does apply to the same
extent and with the same force as in a passenger ac-
tion. * * * We think we give the plaintiff in an em-
ployee's case all the benefit of the maxim to which he
is entitled when we say that it may apply to aid him;
but whether the event does speak, and what it says,
depend upon the facts of the particular case." The
wreck itself does not necessarily imply negligence, but
the facts of the wreck considered in conjunction with
all the circumstances of the case, such as the condition
of the signals at Western Springs and at Stone avenue,
the length of the train, the grade, the speed of the
train, the sudden discovery of the red signal at Stone
avenue, and the effort of the engineer of the extra
freight to stop, are all to be taken together. And as
the only reasonable inference therefrom is that of neg-
ligence, we are of the opinion that the jury were war-
ranted in finding the defendant liable.

In view of the foregoing, we do not deem it necessary to discuss the conduct of Joos in the management of the way freight, as to whether, using ordinary care, and knowing as he did that the extra freight was only about 15 or 16 minutes behind him, he was justified in holding, as he claims he did, the main east track.

As to the contention of counsel that instructions numbers 15 and 16 were objectionable, inasmuch as we are of the opinion that the evidence did tend to show the negligence referred to in each of those instructions, it follows that they were properly given.

As to the contention that the verdict was excessive; the plaintiff was 50 years old, in good health just prior to the injury and earned for his last year's work, as engineer, $2,396. The mass of evidence concerning his injuries need not be analyzed here, especially as this opinion is already too voluminous. The plaintiff's capacity for any valuable kind of service is not only greatly impaired but practically destroyed. He is evidently broken down and unfit to do much work, even of a simple character. His suffering has been very great. However, after considering the matter carefully, we are of the opinion that the verdict is excessive. Under the circumstances, for the plaintiff's pain and suffering and also as a fair recompense for the loss of what he would otherwise have earned in his occupation and has been deprived of the capacity of earning by the wrongful act of the defendant, it is our judgment that $20,000 is a reasonable sum. Provided, therefore, that the plaintiff files a remittitur of all the judgment above the sum of $20,000 within 15 days of the filing of this opinion, the judgment of the Circuit Court will be affirmed; otherwise it will be reversed and the cause remanded for a new trial.

*Affirmed on remittitur; otherwise reversed and remanded.*